UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Felix Russo, as parent and natural guardian
of John Doe 1, a minor, Steve DeLillo, as
parent and natural guardian of Jake DeLillo,
a minor, Shane Fulton and Caleigh Sawicki
on behalf of themselves and all others
similarly situated,

          Plaintiffs,

v.

NCS Pearson, Inc., d/b/a Pearson
Educational Measurement, and College
Entrance Examination Board, d/b/a The
College Board,

          Defendants.

Civ. No. 06-1481 (JNE/SRN)
ORDER

---

T. Joseph Snodgrass, Esq., and Shawn M. Raiter, Esq., Larson King LLP, and J. Gordon Rudd, Esq., Zimmerman Reed, PLLP, appeared for Plaintiffs Felix Russo, as parent and natural guardian of John Doe 1, a minor, Steve DeLillo, as parent and natural guardian of Jake DeLillo, a minor, Shane Fulton and Caleigh Sawicki on behalf of themselves and all others similarly situated.

Stephen P. Lucke, Esq., and William R. Stoeri, Esq., Dorsey & Whitney LLP, appeared for Defendant NCS Pearson, Inc., d/b/a Pearson Educational Measurement.

A. Stephen Hut, Jr., Esq., Bruce M. Berman, Esq., and Jonathan E. Paikin, Esq., Wilmer Cutler Pickering Hale and Dorr LLP, and Robert R. Weinstine, Esq., Winthrop & Weinstine, P.A., appeared for Defendant College Entrance Examination Board, d/b/a The College Board.

---

Plaintiffs are citizens of New York, Massachusetts, and Pennsylvania who have sued the College Entrance Examination Board (College Board) and NCS Pearson, Inc. (NCSP) for damages allegedly caused by Defendants' incorrect scoring and reporting of the October 2005 Scholastic Aptitude Reasoning Test (SAT). The College Board administers the SAT and has retained NCSP to scan the SAT answer sheets. The case is before the Court on Plaintiffs' motion

for preliminary injunctive relief.  In essence, Plaintiffs request that the reported scores of 613 students be reduced and re-reported.  Plaintiffs allege that the scores of these 613 students were incorrectly reported as too high after the initial scanning and scoring of the October 2005 SAT and that subsequent scanning indicated that these students merited scores that were lower than reported.  Also before the Court are Defendants' motions to dismiss certain counts of the complaint for failure to state a claim upon which relief can be granted.  For the reasons set forth below, the Court denies Plaintiffs' motion for a preliminary injunction, and grants in part and denies in part the motions to dismiss by the College Board and NCSP.

## I.      BACKGROUND

Plaintiffs are students, or parents and guardians suing on behalf of students, who took the October 2005 SAT.  Felix Russo is a New York citizen and brings this case on behalf of John Doe, a minor, as his parent and guardian.  Steve DeLillo is also a citizen of New York and brings this case on behalf of Jake DeLillo, a minor, as his parent and guardian.  Caleigh Sawicki and Shane Fulton are citizens of Massachusetts and Pennsylvania, respectively.  Plaintiffs registered for the SAT by paying a test fee to the College Board.  The fee was paid either online or by mail, through registration forms contained in a printed SAT Registration Booklet.  The Registration Booklet states that the "SAT Program's policies for testing are designed to give every student an equal opportunity to demonstrate college readiness and to prevent anyone from gaining an unfair advantage."

Founded in 1900, the College Board is a national not-for-profit association headquartered in New York.  The College Board sponsors the SAT, which is an examination widely used as part of the admissions process by many colleges and universities.  A new version of the SAT was developed and first administered by the College Board in March 2005.  The new version contains

three sections: Critical Reasoning, Math, and Writing.  Each section is scored on a scale from 200 to 800; the highest possible combined score is 2400.  To determine the score, a raw score is first calculated based on the number of points earned for correctly answered questions minus a calculated fraction for each question answered incorrectly.  Through a statistical process called equating, the raw scores are then converted to scaled scores, which are reported on a 200 to 800 scale in ten point intervals.  The College Board uses the equating process to ensure that, within reasonable statistical certainty, a reported score reflects the same level of achievement on the exam irrespective of the edition of the SAT a test taker took and the level of ability of the group of students tested at that particular administration.  In other words, equating makes it possible to make reasonable and fair comparisons among test takers without regard to the edition of the SAT used or when the exam was administered.  Educational Testing Service (ETS) provides psychometric support services, including equating, to the College Board.  ETS performed the initial equating and scaling conversion for the October 2005 SAT as part of its normal procedures in connection with that administration.

The SAT contains an essay question and multiple-choice questions that test takers answer by filling in "bubbles" on an answer sheet.  To scan the SAT answer sheets, the College Board retained NCSP, a Minnesota corporation.  Under a Services Agreement between NCSP and the College Board, NCSP began scanning the SAT answer sheets with the March 2005 administration of the exam.  According to NCSP, its role is limited to scanning the answer sheets and reporting the raw data on the answer sheets to the College Board or its designees.  NCSP asserts that it does not know which answers the College Board considers to be correct, does not tabulate the raw score, has no role in converting the raw scores to a scaled score, and does not report scores to students.

After receiving requests from two test takers to hand score their exams in December 2005, the College Board learned of scoring issues related to the October 2005 administration of the SAT.  In February 2006, the College Board asked NCSP to investigate the cause and scope of the scoring issues.  NCSP ultimately rescanned all of the approximately 495,000 answer sheets from the October 2005 exam.  As a result of the rescanning process, it was determined that 4,411 test takers received initial scores that were too low.  The majority of these scores were understated by less than 100 points on the SAT's 2400-point scale.  Approximately 83 percent of the understated scores were too low by no more than 40 points; less than 5 percent were understated by more than 100 points; ten scores were understated by more than 300 points too low.  All of the named Plaintiffs received scores that initially were understated, but were re-reported before the close of the college admissions season.  The College Board refunded all test fees paid by test takers whose scores were initially underreported.

The College Board also asked ETS to prepare a second equating and scaling conversion for the October 2005 test.  According to ETS, the second conversion yielded virtually identical results to the original conversion.  The only difference appeared in the Writing section, where a raw score of twenty-five converted to a scaled score of 490, as opposed to a score of 500 in the initial conversion.

The rescanning process also revealed that 613 students received scores that were higher than they should have been.  According to the College Board, 550 of the 613 test takers had scores that were overstated by only ten points, fifty-eight had scores that were overstated by twenty points, three had a thirty-point difference, one had a forty-point difference, and one had a fifty-point difference.  The College Board decided not to re-report any score changes that decreased a test taker's score, rationalizing that penalizing test takers for factors beyond their

control would be unfair.

Plaintiffs have filed a fifteen-count amended complaint alleging: (1) negligence and strict liability against NCSP and the College Board; (2) defamation against NCSP and the College Board; (3) breach of contract for damages against the College Board; (4) breach of contract for injunctive relief against the College Board; (5) breach of contract for damages against NCSP; (6) breach of contract for injunctive relief against NCSP; (7) breach of the implied warranty of merchantability against the College Board; (8) breach of the implied warranty of fitness for a particular purpose against the College Board; (9) breach of express warranties against the College Board; (10) breach of the implied warranty of merchantability against NCSP; (11) breach of the implied warranty of fitness for a particular purpose against NCSP; (12) breach of express warranties against NCSP; (13) violation of the Magnuson-Moss Warranty Act against NCSP and the College Board; (14) violation of the Minnesota false advertising and prevention of consumer fraud statutes against NCSP; and (15) violation of the New York consumer protection statutes against the College Board.

## II.    DISCUSSION

### A.    Plaintiffs' motion for a preliminary injunction

Plaintiffs seek a preliminary injunction ordering the College Board (1) to readjust or reduce the actual scores of the students who took the October 2005 administration of the SAT, and who received an improperly overstated or inflated score due to scanning and scoring errors, and (2) to reissue and report the corrected scores of all students who were improperly overscored to the students and institutions to which the students or the College Board reported the incorrect SAT scores.

Injunctive relief may be granted only if the moving party can demonstrate: (1) a

likelihood of success on the merits; (2) the movant will suffer irreparable harm absent the restraining order; (3) the balance of harms favors the movant; and (4) the public interest favors the movant. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). Injunctive relief is an extraordinary remedy, *see Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc.*, 815 F.2d 500, 503 (8th Cir. 1987), and the party requesting the injunction bears the "complete burden" of proving all the factors listed above. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987). In analyzing requests for preliminary injunction, the four *Dataphase* factors must be balanced to determine whether they tilt toward or away from granting a preliminary injunction. *West Publ'g Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986). The likelihood that a plaintiff will ultimately prevail is meaningless in isolation. *Dataphase*, 640 F.2d at 113. As such, the Court will examine each of the four *Dataphase* factors in turn.

Plaintiffs argue that they are likely to succeed on the merits of their breach of contract claims. Under Minnesota law, a breach of contract claim consists of four elements: (1) a valid contract; (2) performance by the plaintiff of any conditions precedent; (3) a material breach of the contract by the defendant; and (4) damages. *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 961 (D. Minn. 2000) (citing *Briggs Trans. Co. v. Ranzenberger*, 217 N.W.2d 198, 200 (Minn. 1970)). By registering for the October 2005 SAT exam, Plaintiffs contend that they entered into contracts of adhesion with the College Board. The College Board does not dispute the existence of any contracts with Plaintiffs, but argues that Plaintiffs can establish neither a breach of a material term of the contract, nor damages from the alleged breach.

The focal point for Plaintiffs' breach of contract claims is found in the SAT Registration Booklet, in which the College Board states that the "SAT Program's policies for testing are designed to give every student an equal opportunity to demonstrate college readiness and to

prevent anyone from gaining an unfair advantage." By refusing to readjust the scores of the 613 students with improperly inflated scores, Plaintiffs allege that the College Board has breached a material duty to prevent anyone from gaining an unfair advantage. Minnesota courts have concluded that a breach is material when "one of the primary purposes" of a contract is violated. *Steller v. Thomas*, 45 N.W.2d 537, 542 (Minn. 1950). The College Board's stated policy to prevent any unfair advantage speaks to the primary purpose of the contract. Plaintiffs paid the College Board in order to take a test that would accurately reflect their college readiness in comparison to all other SAT test takers. Plaintiffs have a legitimate expectation that the College Board score and report all test takers' exams accurately. By refusing to readjust and re-report the improperly inflated exam scores, the College Board has placed Plaintiffs at a competitive disadvantage to 613 students. Accordingly, the Court concludes that it is likely that Plaintiffs will be able to prove that the College Board materially breached the contract.

Whether the College Board's breach caused any damage to Plaintiffs is less certain. As an example of the alleged damages, Plaintiffs have presented the case of Plaintiff John Doe. Doe applied to the University of Virginia, but was denied admission prior to learning of the scoring error. Doe originally received a score of 1960 on his October 2005 SAT, which was eventually re-reported as a 2000. It is unknown whether any of the 613 test takers who received inflated scores were admitted to the University of Virginia, but the College Board has revealed that seven of the group of 613 test takers requested that their scores be sent to the University of Virginia. The seven overstated scores reported to the University of Virginia were 900, 1500, 1620, 1760, 1830, 1880, and 1940. Although these scores fall below Doe's reported score of 1960, the differences are not so great as to allow the Court to conclude that none of the students could have been admitted in place of Doe. This is especially true given the fact that an applicant's SAT

score is but one of several factors considered by colleges and universities in the admissions process.

In addition to an SAT score, schools often consider a student's high school academic record, letters of recommendation, personal statements, talents, personal diversity factors, and interviews as part of the admissions process.  Although consideration of these factors increases the possibility that Doe could have lost a spot to one of the 613 test takers with overstated scores, their inclusion also muddles the potential impact of reduced, re-reported SAT scores.  Because an SAT score is only one of several factors considered in admissions, it is difficult to predict the likelihood that the College Board's decision to withhold the revised SAT scores of 613 test takers damaged Plaintiffs.  Nevertheless, the fact that an SAT score is not the sole criterion for college admissions minimizes the likelihood that the College Board's breach is responsible for any damage to Plaintiffs.

Regardless of the likelihood of success of Plaintiffs' contract claim, injunctive relief is only appropriate in cases where the moving party demonstrates a sufficient threat of irreparable harm.  *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999).  "Irreparable" harm is that for which there is no adequate remedy at law in the form of damages.  *See Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).  Plaintiffs argue that the failure to readjust all October 2005 scores presents immediate and irreparable harm because students with accurate scores are placed at a disadvantage versus the overscored students in competing for admissions, scholarships, and financial aid.  Plaintiffs allege that this disadvantage cannot be quantified in terms of actual damages and is therefore harm suitable for injunctive relief.  Because Plaintiffs have brought this action on behalf of themselves and all others similarly situated, it is appropriate for the Court to consider the threat of irreparable harm to the putative class members.  *See*

*Herrera v. Riley*, 886 F. Supp. 45, 52 (D.D.C. 1995) (addressing the threat of irreparable injury to the entire proposed class, not just the named plaintiffs); *Joyce v. City of San Francisco*, 846 F. Supp. 843, 854 (N.D. Cal. 1994) ("Since a determination has not yet been made whether plaintiffs can proceed as a class, it is appropriate at this stage that the Court considers the injuries alleged to the individuals within the entire proposed class."); *Sharif v. N.Y. State Educ. Dep't*, 709 F. Supp. 345, 359 (S.D.N.Y. 1989) (concluding for purposes of an irreparable harm analysis that although the named plaintiffs might not receive an award on the basis of their SAT scores, some members of the putative class would).

Although a student's ability is rarely measured solely on a numerical scale, the Court recognizes the SAT's primary importance to certain aspects of the college admissions and scholarship processes. Plaintiffs have presented several examples of merit scholarships requiring minimum SAT scores for eligibility. Additionally, Plaintiffs observe that a ten point SAT score differential can dictate whether students receive athletic scholarships or are eligible to participate in athletics. To participate in Division I or Division II athletics as a first-year student or to receive an athletic scholarship, high school seniors must be certified by the NCAA Initial-Eligibility Clearinghouse. Division II athletes must receive a score of 820 on the SAT to fully participate in athletics. To qualify for a Division I scholarship, students must receive a minimum ACT or SAT score. The minimum required SAT score varies depending on the student's high school grade point average. For Division I athletes, the SAT sliding scale used to determine scholarship and eligibility establishes minimum cut-offs in ten-point increments.

The Court acknowledges that a ten-point variation in SAT scores can affect the prospects of a student seeking a merit scholarship or the eligibility of a student athlete; nevertheless, Plaintiffs have failed to tie the potential harm inherent in a ten-point variation to any concrete,

real world consequence.  Instead, Plaintiffs allege that many of the overstated scores are held by students who have yet to apply for college admission, scholarships, or athletic eligibility. Additionally, Plaintiffs contend that many of the October 2005 SAT test takers will use their scores in the years to come in order to transfer schools or to apply for jobs.  Lacking any specific supporting evidence, Plaintiffs' assertions of irreparable harm are speculative.  Where "[t]he possible harm identified is wholly speculative . . . it cannot be called irreparable harm." *Local Union No. 884, United Rubber, Cork, Linoleum, & Plastic Workers of Am. v. Bridgestone/Firestone, Inc.*, 61 F.3d 1347, 1355 (8th Cir. 1995); *see also Ben-Yonatan v. Concordia College Corp.*, 863 F. Supp. 983, 986 (D. Minn. 1994) (rejecting as purely speculative an argument that a one-year suspension from college might prohibit a student's future admission to medical school).

Plaintiffs argue that they need merely show the possibility of irreparable harm to some members of the putative class.  In support of this proposition, Plaintiffs cite to *Sharif*, which involved a claim that the SAT and a scholarship program based solely on SAT scores unfairly discriminated against women.  In *Sharif*, the court found irreparable harm based on the fact that some members of the putative class would qualify for a scholarship based solely on their SAT scores.  In contrast, however, Plaintiffs here have not produced any evidence that members of the putative class would receive admission to a school or a scholarship if the injunction were granted.

The specter of irreparable harm absent an injunction is further mitigated by several considerations.  First, as discussed above, SAT scores are but one factor among many considered by schools in making admissions decisions.  Second, the difference between the initial and corrected scores for the majority of the group of 613 test takers is relatively slight.  Of the group

of 613 test takers, 550 had scores that were overstated by ten points; fifty-eight had scores that were overstated by twenty points; and the five remaining test takers received scores that were overstated by fifty points or less.   None of the overstated scores fell outside of the SAT's standard error of measurement[1] or standard error of difference.[2]   Finally, a significant portion of the 613 overstated scores is unlikely to be used in the decision-making process for any admission spot or scholarship award.   For example, 215 of the 613 test takers had higher scores on file, meaning the October 2005 scores were unlikely to be used; 157 did not ask the College Board to report their overstated score to any school, although it is unclear to what extent there is overlap between this group and the group that already had higher scores on file; and fifty-five were not high school seniors when they sat for the October 2005 exam, meaning that they might retake the exam before applying to college.

These factors make it improbable that any one of the 613 test takers with an overstated SAT score will take an admission spot or scholarship from a putative class member on the basis of the overstated score.   Accordingly, any harm presented by these overstated scores potentially affects only a small percentage of putative class members.   Furthermore, even if one of the 613 test takers has been admitted to a college class or received a scholarship award to which one of

---

[1]      The standard error of measurement is a statistical term that describes the extent to which a test taker's observed score on any single test administration might differ from his or her "true" ability.   The standard error of measurement for the SAT is thirty points for the Critical Reading and Math sections, and forty points for the Writing section.

[2]      In contrast to the standard error of measurement, the standard error of difference is a statistical term that describes the extent to which two test takers' scores must differ in order to indicate a difference of ability.   The standard error of difference for the SAT is roughly forty points for the Critical Reading and Math sections, and fifty points for the Writing section.   The College Board advises colleges that they can be reasonably confident that a score differential represents a difference in ability between two test takers when it is 1.5 times the standard error of difference.   For example, SAT Critical Reading and Math scores must differ by 60 points (40 x 1.5) in order to indicate true differences of ability.

the putative class members had applied, Plaintiffs have not shown that the injunctive remedy sought would provide relief in the form of admission to a school or the grant of a scholarship from which they were previously denied. As such, Plaintiffs' requested relief – to enjoin the College Board to report the corrected scores for the 613 test takers who received overstated scores – is unlikely to address the alleged irreparable harm.

In addressing the balance of harms, "[t]he essential inquiry in weighing the equities 'is whether the balance of other factors tips *decidedly* toward the movant.'" *ASICS Corp. v. Target Corp.*, 282 F. Supp. 2d 1020, 1031 (D. Minn. 2003) (quoting *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 624 (8th Cir. 1987) (emphasis in original). Plaintiffs argue that the College Board will suffer little or no harm in re-adjusting and re-scaling all scores. The College Board responds in kind, arguing that Plaintiffs will suffer little or no harm absent an injunction. The Court notes that at this early stage of the litigation when the actual cause of the incorrect scores remains a mystery, the possibility exists that another round of rescoring could yield a different round of incorrect scores. Should the true cause of the incorrect scoring be discovered at a later date, yet another round of rescoring could be in order. The possibility of multiple rounds of incorrect scores presents a potential harm to the business of both the College Board and NCSP in the form of lost consumer confidence.

The Court is concerned about the potential impact that an injunction would have on the group of 613 test takers whose scores were overstated. *See DeLite Outdoor Adver. v. City of St. Paul*, 167 F. Supp. 2d 1072, 1075 (D. Minn. 2001) (finding that the court should also consider the "injury that granting the injunction will inflict on other interested parties"). Although the Court accepts, as a matter of common sense, the College Board's argument that it would be unlikely that admissions or scholarships would be rescinded, it would be unfair to re-report the

613 scores at this time for several reasons.  First, this group of test takers has already relied on their scores.  As Plaintiffs press, it is possible that there is a student athlete in the group of 613 who barely met the minimum athletic eligibility score.  That student athlete likely would have foregone the opportunity to retest because she believed that she had already qualified.  This stands in contrast to the hypothetical test taker who barely missed his athletic eligibility cut-off score but had the opportunity to retest in order to meet his goal.  Second, the potential harm to the group of 613 is exacerbated by the potential for subsequent rounds of rescoring.  Finally, should the Court enter an injunction, the potential harm faced by the group of 613 students whose scores were overstated is more immediate than the potential benefit to Plaintiffs or putative class members.  In the unlikely event that one of the group would lose an admission spot or scholarship award, there is no guarantee that any Plaintiff or putative class member would benefit.  In other words, any potential benefit appears one hypothetical step more distant than the potential harm.

Plaintiffs argue that there is great public importance to the accurate scoring and reporting of the SAT, not only to the putative class but also to the educational institutions that rely on the test scores, scholarship providers, and other students and parents.  The College Board counters that there is a public interest in the finality of the college admissions process.  While the Court sees the merits in both positions, the Court questions whether Plaintiffs' goal of accurate reporting is best served by issuing an injunction before the root causes of the scoring errors are known.

Plaintiffs seek an injunction ordering the College Board to reissue and report the corrected scores of the 613 student whose exams were improperly overscored to the students and institutions to which the incorrect SAT scores were reported.  This is substantially the same relief

that Plaintiffs would receive after a trial on the merits.   "[T]he burden on a movant to demonstrate that an injunction is warranted is heavier when granting the preliminary injunction will in effect give the movant substantially the relief it would obtain after a trial on the merits." *Rathmann Group v. Tanenbaum*, 889 F.2d 787, 790 (8th Cir. 1989).   Having considered all of the factors discussed above, the Court declines to exercise its equitable jurisdiction to grant the extraordinary relief requested by Plaintiffs.   Accordingly, Plaintiffs' motion for a preliminary injunction is denied.

**B.      The College Board's motion to dismiss non-contract claims**

Pursuant to Rule 12(b)(6), the College Board seeks the dismissal of all counts against it except for the two counts alleging breach of contract.   In ruling on a motion to dismiss a complaint for failure to state a claim upon which relief can be granted, a court must accept the complaint's factual allegations as true and construe them in the light most favorable to the plaintiff.   *Midwestern Mach., Inc. v. Nw. Airlines, Inc.*, 167 F.3d 439, 441 (8th Cir. 1999); *Davis v. Hall*, 992 F.2d 151, 152 (8th Cir. 1993).   The court will not dismiss the complaint unless it appears beyond doubt that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief.   *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 740 (8th Cir. 2002).   The court may consider the complaint, matters of public record, materials embraced by the complaint, and exhibits attached to the complaint.   *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

Nether the College Board nor Plaintiffs identify any conflict of law issues.   With the exception of the claim based on the New York consumer protection statute, the Court will apply laws of Minnesota because "[t]he operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which it sits."

*BBSerCo, Inc. v. Metrix Co.*, 324 F.3d 955, 960 n.3 (8th Cir. 2003) (citing *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991)).

1.      **Negligence and strict liability**

In count one of the amended complaint, Plaintiffs allege that the College Board's actions were negligent and rendered the College Board strictly liable for Plaintiffs' damages.  Plaintiffs contend that independent of any contractual duties, the College Board also had a duty to timely identify errors in scoring prior to the reporting of scores, and to provide accurately administered, scored, and reported exams.  Specifically, Plaintiffs allege that the College Board: (1) failed to accurately score and scale the October 2005 SAT; (2) failed to properly identify all persons adversely affected by  the scoring errors; (3) failed to properly re-score the examinations; (4) failed to immediately notify test takers and institutional authorities of incorrect scoring; (5) failed to timely implement effective audit or quality control procedures; and (6) failed to implement appropriate procedures to prevent scoring errors and inaccuracies.

The College Board responds that it owes no duties to the Plaintiffs independent of a contract.  This argument is based on the independent duty rule,  which provides that when a contract defines a relationship between two parties, a plaintiff is not entitled to recover tort damages save for exceptional cases in which a breach of contract "constitutes or is accompanied by an independent tort."  *Wild v. Rarig*, 234 N.W.2d 775, 789-90 (Minn. 1975).  Minnesota follows the independent duty rule, but recognizes an exception for providers of professional services.  *See City of Mounds View v. Walijarvi*, 263 N.W.2d 420, 423 (Minn. 1978).  This exception has been limited to a handful of specialized professionals such as "[a]rchitects, doctors, engineers, attorneys, and others."  *Id.* at 424.

Plaintiffs contend that the duties named in the amended complaint, namely the duties to

timely identify errors in scoring prior to the reporting of scores, and to provide accurately administered, scored, and reported exams, reflect duties consistent with the rendering of professional services.  Plaintiffs seek discovery on this issue, believing that the factual record could reveal that the professional disciplines of psychometrics and educational measurement, which are involved in the College Board's administration of the SAT, will support a claim of negligence under the professional exception to the independent duty rule.  Although the cause of the initial reporting of incorrect scores is unknown at this early stage, one theory involves the scoring and equating process.  Plaintiffs' complaint suggests that the College Board should have detected anomalies in the scoring of the October 2005 SAT prior to and irrespective of the two requests for hand scoring that first brought the errors to the College Board's attention.

The question of whether a psychometrician should be treated the same as a doctor, lawyer, architect, or engineer for purposes of the professional exception to the independent duty rule is novel.  To better gauge whether psychometricians would be included by Minnesota courts in the professional exception to the independent duty rule, the Court turns to the Minnesota Supreme Court's statement of the rationale for the exception:

> The reasoning underlying the general rule as it applies both to architects and other vendors of professional services is relatively straightforward. Architects, doctors, engineers, attorneys, and others deal in somewhat inexact sciences and are continually called upon to exercise their skilled judgment in order to anticipate and provide for random factors which are incapable of precise measurement. The indeterminate nature of these factors makes it impossible for professional service people to gauge them with complete accuracy in every instance. Thus, doctors cannot promise that every operation will be successful; a lawyer can never be certain that a contract he drafts is without latent ambiguity; and an architect cannot be certain that a structural design will interact with natural forces as anticipated. Because of the inescapable possibility of error which inheres in these services, the law has traditionally required, not perfect results, but rather the exercise of that skill and judgment which can be reasonably expected from similarly situated professionals.

*Mounds View*, 263 N.W.2d at 424.  Even given this guidance, the Court remains unsure whether

psychometricians should be included in the professional exception to the independent duty rule. On one hand, it appears to the Court that the "skilled judgment" of the psychometrician is called on with each administration of the SAT exam in order to, in the words of the Minnesota Supreme Court in *Mounds View*, "anticipate and provide for random factors which are incapable of precise measurement." Indeed, the psychometrician's work product carries with it standard errors of measurement and standard errors of difference. On the other hand, the psychometricians involved in the administration of the SAT have refined their craft to the point where they can convert raw test results across multiple administrations of the exam into scaled scores in order to compare the abilities of millions of students within reasonable statistical certainty. Additionally, there is no caselaw to indicate that the professional exception to the independent duty rule applies where there is no direct privity between a plaintiff and the professional whose services are at issue. Plaintiffs here have not contracted directly with a psychometrican, nor is the contract primarily for psychometric services.

Nevertheless, unless it appears beyond doubt that Plaintiffs cannot prove any set of facts in support of their claim that would entitle them to relief, the Court will not dismiss the complaint. *See Conley*, 355 U.S. at 45-46; *Schaller Tel.*, 298 F.3d at 740. Plaintiffs' amended complaint suggests that the College Board should have timely identified errors in scoring prior to the reporting of scores. At this early stage of the litigation, the Court concludes that it would be premature to dismiss Plaintiffs' claim for negligence. Accordingly, the Court denies the College Board's motion to dismiss Plaintiffs' negligence claim in count one of the amended complaint.

Turning to the strict liability claim, in order to succeed under Minnesota law, a plaintiff must prove that (1) a product was in a defective condition, unreasonably dangerous for its intended use, (2) the defect existed when the product left defendant's control, and (3) the defect

was the proximate cause of the injury sustained. *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 349 F.3d 1054, 1060 (8th Cir. 2005) (citing *Lee v. Crookston Coca-Cola Bottling Co.*, 188 N.W.2d 426, 432 (1971)). Minnesota has adopted the theory of strict liability presented in Restatement (Second) of Torts § 402A (1977), which requires the "unreasonably dangerous" condition of the product to cause some "physical harm" to the consumer. *See Hegna v. E.I. du Pont de Nemours & Co.*, 806 F.Supp. 822, 831 (D. Minn. 1992) (citing *McCormack v. Hankscraft Co.*, 154 N.W.2d 488, 496 (Minn. 1967)).

Plaintiffs argue that they are entitled to conduct discovery into what constitutes an unreasonably dangerous activity and to determine whether a product defect led to the mis-scoring of the October 2005 SAT. Generally, the question of whether a product is defective is a matter of fact. *See Drager v. Aluminum Indus.*, 495 N.W.2d 879, 882 (Minn. App. 1993). Where reasonable minds cannot differ, however, the question becomes one of law. *Id.* (citing *Peterson v. Little-Giant Glencoe Portable Elevator Div. of Dynamics Corp. of Am.*, 366 N.W.2d 111, 116 (Minn. 1985)). Plaintiffs argue that the SAT test booklet, answer sheets, and score reports constitute products capable of giving rise to claims for strict liability. However, no reasonable mind could maintain that these paper products could prove to be unreasonably dangerous for their intended uses in any manner so as to cause physical harm. Although the Court recognizes that the SAT test taking experience instills great stress in thousands of test takers, such stress does not satisfy the physical harm requirement of Minnesota law. *Cf. Gryc v. Dayton-Hudson Corp.*, 297 N.W.2d 727, 741 (Minn. 1980) (concluding that manufacturer of instantaneously combustible pajamas was strictly liable for burns suffered by a child); *Farr v Armstrong Rubber Co.*, 179 N.W.2d 64, 71 (Minn. 1970) (applying strict liability standard to a case involving the blowout of a truck tire leading to severe physical injuries); *McCormack*, 154

N.W.2d 488 (imposing strict liability on the manufacturer of an electric steam vaporizer that caused severe burns to a child).  Accordingly, the Court dismisses Plaintiffs' claim for strict liability against the College Board in count one of the amended complaint.

### 2. Defamation

In count two of the amended complaint, Plaintiffs allege that the College Board's reporting of incorrect scores to test takers, high school counselors, and college-admissions officials constituted defamatory statements.  To establish that a statement is defamatory under Minnesota law, a plaintiff must demonstrate that the statement is false, was communicated to a third party, and tends to harm the plaintiff's reputation.  *Bol v. Cole*, 561 N.W.2d 143, 146 (Minn. 1997).  Additionally, in cases where defamation is asserted along with a claim for breach of contract, "the defamation must be independent of the alleged breach of contract and not a part of the malicious conduct associated with the breach."  *Pillsbury Co. v. Nat'l Union Fire Ins. Co.*, 425 N.W. 2d 244, 250 (Minn. Ct. App. 1988) (citing *Wild v. Rarig*, 234 N.W.2d 775, 789 (Minn. 1975)).

Plaintiffs attempt to distinguish *Pillsbury* by noting that the case involved a claim for trade defamation, which is a separate cause of action from defamation.  Nevertheless, both *Pillsbury* and *Wild* stand for the broader proposition that a plaintiff is typically limited to contract damages "except in exceptional cases where the defendant's breach of contract constitutes or is accompanied by an independent tort."  *Wild*, 234 N.W. 2d at 789.  In this case, Plaintiffs have not provided any reason that their defamation claim should be considered independent of the alleged breach of contract.  The College Board's reporting of scores was a contractual duty owed to the test takers.  In fact, Plaintiffs' breach of contract claim depends on the fact that the College Board misreported the scores.  Furthermore, Plaintiffs have not alleged

that any malice drove the College Board's reporting of the scores.   Accordingly, the Court dismisses the defamation claim against the College Board in count two of the amended complaint.

### 3.        Implied and express warranties

In counts seven and eight of the amended complaint respectively, Plaintiffs allege that the College Board breached the implied warranties of merchantability and fitness for particular purpose.   In count nine, Plaintiffs allege breach of express warranty.   The implied warranty provisions of Minn. Stat. §§ 336.2-314 – .2-315 (2005), and the express warranty provision of Minn. Stat. § 336.2-313 are taken from Article 2 of the Uniform Commercial Code (UCC).   Like all provisions taken from Article 2, these provisions apply only to the sale of goods, not the sale of services.   *See LeSueur Creamery, Inc. v. Haskon, Inc.*, 660 F.2d 342, 346 (8th Cir. 1981).

Plaintiffs characterize the SAT as a product consisting of physical paper booklets, a physical answer sheet, and a physical written score report.   The College  Board argues that the SAT is a service, not a product; the tangible goods they use are incidentally involved in the rendition of a service, namely the administration, scoring, and reporting of the exam.   In fact, two of three physical goods cited by Plaintiffs are collected by the College Board after the administration of the test.   The only physical object retained by Plaintiffs is the score report.

Assuming without deciding that the contract is a mixed contract for the sale of both goods and services, Minnesota courts use the "predominant purpose" test to determine whether Article 2 applies to such a contract.   "The test [for mixed contracts is] whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (*e.g.*, contract with artist for painting) or is a transaction of sale, with labor incidentally involved (*e.g.*, installation of a water heater in a bathroom)."   *AKA Distrib. Co. v.*

*Whirlpool Corp.*, 137 F.3d 1083, 1085 (8th Cir. 1998).  In the same way that an artist cannot fill a canvas without paint, the College Board cannot administer, score, and report SAT results without the test booklet, answer sheet, and score report.  Although the service provided by the College Board ultimately resulted in a score printed on a piece of paper, that piece of paper is not the predominant factor; it is the service provided by the College Board that predominates the transaction.  Accordingly, the Court dismisses counts seven, eight, and nine of the amended complaint.

4.      **Magnuson-Moss Warranty Act**

In count thirteen of the amended complaint, Plaintiffs allege that the College Board violated the the Magnuson-Moss Warranty Act (MMWA).  The MMWA provides a private cause of action to "a consumer," 15 U.S.C. § 2310(d)(1) (2006).  A "consumer" is defined as "a buyer . . . of any consumer product."  *Id*. § 2301(3).  A "consumer product" means "any tangible personal property which is . . . normally used for personal, family, or household purposes."  *Id.* § 2301(1).  Therefore, "[i]n order for the Act to apply, there must be the sale of a consumer product."  *Kemp v. Pfizer*, 835 F. Supp. 1015, 1024 (E.D. Mich. 1993).

The Federal Trade Commission has promulgated guidelines giving examples of "consumer products" that fit the MMWA's definition and application.  The examples include "boats, photographic film and chemicals, clothing, appliances, jewelry, furniture, typewriters, motor homes, automobiles, mobile homes, vehicle parts and accessories, stereos, carpeting, small aircraft, toys, and food."  *Magnuson-Moss Warranty Act: Implementation and Enforcement Policy*, 40 Fed. Reg. 25,721, 25,722 (1975).  The legislative history of the MMWA lists similar examples of consumer products:  "washing machines and dryers, freezers, ranges, refrigerators, water heaters, bed coverings, blenders, broilers, can openers, coffee makers, corn poppers, floor

polishers, frypans, hair dryers, irons, toasters, vacuum cleaners, waffle and sandwich grills, air conditioners, fans, radios, televisions, and tape recorders." H.R. Rep. No. 1107, 93d Cong., 2d Sess. 4, *reprinted in* 1974 U.S.C.C.A.N. 7702, 7705-06.   In contrast, neither the services performed by the College Board, nor the physical products (the SAT examination booklet, answer sheet, and score report) can properly be construed as "tangible personal property . . . normally used for personal, family, or household purposes," to which the MMWA is typically directed.  Accordingly, the Court dismisses count thirteen of the amended complaint.

5.      **New York consumer protection statutes**

In count fifteen of the amended complaint, Plaintiffs have alleged that the College Board violated Section 349(a) of the New York General Business Law, commonly known as the New York Consumer Protection Act.   That statute prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. Gen. Bus. L. § 349(a) (McKinney 2005).  Defendants move to dismiss this count on the ground that the complaint does not contain sufficient particularity and that the statute does not apply to the facts alleged here for various reasons, including that the events arose in the course of a contract.

The Court makes three initial observations concerning the New York Consumer Protection Act.  Notably, the Act may not require any intent to deceive, although a finding of intentional deception opens the door to treble damages up to $1,000.  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 647 N.E.2d 741, 745 (N.Y. 1995); *but see Eastern Am. Trio Prod., Inc. v. Tang Elec. Corp.*, 97 F. Supp. 2d 395, 423 (S.D.N.Y. 2000) ("Section 349 is a consumer protection statute, and requires a finding of intentional deception of consumers in order for plaintiff to prevail.").  Second, the fact that an alleged deceptive practice arises out of contractual relationships probably does not, by itself, take the practice out of the ambit of the

statute.  However, the statute does not appear to have been intended to turn a simple breach of contract into a tort, and several decisions of the New York state appellate courts have held as much.  *See*, *e.g.*, *Hassett v. N.Y. Cent. Mut. Fire Ins. Co.*, 753 N.Y.S.2d 788, 789 (N.Y. App. Div. 2003); *Graham v. Eagle Distrib. Co.*, 637 N.Y.S.2d 583, 584 (N.Y. App. Div. 1996); *Teller v. Bill Hayes, Ltd.*, 630 N.Y.S.2d 769, 774 (N.Y. App. Div. 1995).  Third, the parties disagree about whether the statute is subject to general or heightened specificity pleading requirements but agree that the complaint here does not specify the particular action that was deceptive.

Plaintiffs claim that the College Board led consumers to believe that the scoring of the SAT would be accurate.  Plaintiffs do not, however, allege that the test as a whole is deceptive or even that the entirety of the scoring of the October 2005 test was erroneous.  In fact, part of what plaintiffs seek is an injunction disseminating additional scores from that very test.  This is not the sort of situation that the consumer fraud statute in New York was intended to cover.  Regardless of any scienter requirement that may or may not be in the statute, the "act or practice" must surely have been deceptive at the time it was done and not merely wrong due to subsequent events.

Section 349(a) has been invoked to address false advertising, pyramid schemes, deceptive collection efforts, deceptive insurance practices, "bait and switch" operations, and alleged deceptive representations by a fast food distributor leading to obesity and other health issues in consumers.  *See Teller*, 630 N.Y.S. 2d at 774; *Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005).  "The typical violation contemplated by the statute involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising."  *Genesco Enter't v. Kock*, 593 F. Supp. 743, 751 (S.D.N.Y. 1984).  The allegations made by Plaintiffs that the College Board led consumers to believe that

the test would be scored accurately does not indicate any deception at the time such promise was made.  Accordingly, the Court dismisses count fifteen of the amended complaint.

## C.   NCSP's motion to dismiss

### 1.   Breach of contract

In counts five and six of the amended complaint, Plaintiffs allege that they were the intended beneficiaries of one or more contracts between NCSP and the College Board.  Plaintiffs also allege that NCSP breached its contractual duty to scan the SAT answer sheets accurately and appropriately.  NCSP argues that under the terms of its Services Agreement with the College Board, Plaintiffs cannot be considered intended beneficiaries.  The Services Agreement states in relevant part:

> No Third-Party Beneficiary Rights.  No provision of this Agreement shall in any way inure to the benefit of any third person (including the public at large) so as to constitute any person a third-party beneficiary of the Agreement of any one or more of the terms hereof, or otherwise give rise to any cause of action in any person not a party hereto.

Plaintiffs argue that the Services Agreement should not be considered by the Court because the full agreement was not produced until after Plaintiffs responded to NCSP's motion to dismiss.  As such, Plaintiffs argue that they did not receive an adequate opportunity to respond to NCSP's arguments concerning the Services Agreement.  Nevertheless, Plaintiffs' complaint refers to a contract pursuant to which NCSP agreed to scan the SAT tests.  When considering a motion for judgment on the pleadings, a court may consider materials necessarily embraced by the pleadings. *See Porous Media Corp.*, 186 F.3d at 1079.  Furthermore, portions of the Services Agreement were attached to NCSP's motion to dismiss with an averment that the full agreement would be made available to Plaintiffs upon entry of a protective order.  A copy of the entire Services Agreement was then provided to Plaintiffs following the entry of a protective order.

Accordingly, the Court concludes that it may appropriately consider the Services Agreement.

The Services Agreement contains a choice of law provision that states "[t]he validity, interpretation, and performance of this Agreement shall be governed by the laws of the State of New York." The choice of law clause applies to the question of whether Plaintiffs are intended third party beneficiaries. *See Am. Patriot Ins. Co. v. Mut. Risk Mgmt., Ltd.*, 364 F.3d 884, 890 (7th Cir. 2004) ("Insofar as the plaintiff's third-party beneficiary claim is concerned, the plaintiff is indeed bound by the choice of law . . . clause[] in the contract."). In determining whether a party can be considered an intended beneficiary of a contract, New York law looks to the express terms of the contract. "Under New York law, where a provision in a contract expressly negates enforcement by third parties, that provision is controlling." *Morse/Diesel, Inc. v. Trinity Industries, Inc.*, 859 F.2d 242, 249 (2d Cir. 1988). Because the Services Agreement explicitly provides that "[n]o provision of this Agreement shall in any way inure to the benefit of any third person," Plaintiffs cannot be considered third party beneficiaries of the Services Agreement. Accordingly, the Court dismisses Plaintiffs' breach of contract claims against NCSP.

### 2.      Negligence and strict liability

In count one of the amended complaint, Plaintiffs allege that NCSP's actions were negligent and rendered NCSP strictly liable for Plaintiffs' damages. Independent of any contractual duties, Plaintiffs allege that NCSP had a duties to timely identify errors in scoring prior to the reporting of scores and to provide accurately administered, scored, and reported exams. Specifically, Plaintiffs allege that NCSP: (1) failed to accurately score and scale the October 2005 SAT; (2) failed to properly identify all persons adversely affected by the scoring errors; (3) failed to properly re-score the examinations; (4) failed to immediately notify test takers and institutional authorities of incorrect scoring; (5) failed to timely implement effective

audit or quality control procedures; and (6) failed to implement appropriate procedures to prevent scoring errors and inaccuracies.

One theory addressing the cause of the scoring errors suggests that the answer sheets were in some way defective.  According to this theory, the answer sheets were scanned incorrectly because they were either inherently defective or had been exposed to excessive moisture and humidity at some point causing them to deform.  Plaintiffs argue that NCSP is negligent for either supplying the defective answer sheets or damaging the answer sheets in their care.

In response, NCSP argues that Plaintiffs cannot recover in tort based on NCSP's contractual obligations to the College Board.  As discussed in response to the College Board's motion to dismiss Plaintiffs' negligence claim, Minnesota follows the independent duty rule.  *See Wild*, 234 N.W.2d at 789-90.  NCSP argues that none of the circumstances embraced by Plaintiffs' allegations of negligence are independent of NCSP's contractual duties under the Services Agreement.  As has been discussed, however, Plaintiffs are not third party beneficiaries of the Services Agreement and have no claim for breach of contract.  NCSP has not cited to any Minnesota case in which the independent duty rule has been applied to parties not in privity.  *Cf. Zontelli & Sons, Inc. v. City of Nashwauk*, 353 N.W.2d 600, 604 (Minn. Ct. App. 1984) (concluding that a general contractor's claim against an engineer with which it was not in privity sounded not in negligence, but in contract under the general contractor's third party beneficiary claim against the engineer), *rev'd on other grounds*, 373 N.W.2d 744, 756 (Minn. 1985) (declining to decide whether the general contractor had a direct action against the engineer for negligence because the practical result would be the same under the contract claim).  As such, it strikes the Court as unfair to hold at this stage, as a matter of law, that Plaintiffs lack a tort

remedy because the alleged tort arose in the context of the performance of a contract to which they were strangers.  Given that the cause of the scoring errors is undetermined, the Court cannot conclude that Plaintiffs cannot prove any set of facts in support of their claim that would entitle them to relief.  Accordingly, the Court concludes that it would be premature to dismiss Plaintiffs' claim for negligence and denies the NCSP's motion to dismiss Plaintiffs' negligence claim.

Turning to the strict liability claim, Plaintiffs argue that their claim for strict liability against NCSP should survive because it is possible that NCSP supplied defective paper products or used inferior ink in its support of the SAT administration.  For the same reasons addressed above in response to the strict liability claim against the College Board, the Court concludes that no reasonable person could maintain that the paper products or ink used in association with the SAT could prove to be unreasonably dangerous for their intended uses in any manner as to cause physical harm.  Accordingly, the Court dismisses Plaintiffs' claim for strict liability against NCSP.

### 3.      Defamation

In count two of the amended complaint, Plaintiffs allege that NCSP defamed them by reporting incorrect scores to parents, high school counselors, college admissions officials, and others.  In response, NCSP presents three arguments in support of its motion to dismiss this count.  First, in an argument similar to that made by the College Board, NCSP points out that none of the allegedly defamatory statements were made independent of its contractual duties.  It argues that Plaintiffs cannot identify any exceptional circumstances as required by the independent duty rule.  *See Wild*, 234 N.W.2d at 789-90.  NCSP argues that those circumstances that would justify a finding of the alleged breach of contract – the incorrect scanning, scoring, and reporting of SAT scores – are coincident with the alleged incorrect scanning, scoring, and

reporting that constitute Plaintiffs' defamation claim and are therefore not actionable under tort. As has been discussed, however, Plaintiffs are not third party beneficiaries of the Services Agreement and have no claim for breach of contract.

NCSP also argues that the defamation count should be dismissed for want of particularity in pleading. "Minnesota law has generally required that in defamation suits, the defamatory matter be set out verbatim." *Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 326 (Minn. 2000); *see Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1011 (8th Cir. 2005) ("Minnesota law requires that a claim for defamation must be pled with a certain degree of specificity. At a minimum, the plaintiff must allege who made the allegedly libelous statements, to whom they were made, and where." (citation and quotations omitted)). The manner of setting forth allegations is a matter of procedure, not substance, and although a federal court cannot be bound by a state's technical pleading rules, verbatim allegations of defamation are favored. *See Asay v. Hallmark Cards, Inc.*, 594 F.2d 692, 699 (8th Cir. 1979). In count two of the amended complaint, Plaintiffs allege that NCSP and the College Board incorrectly reported SAT scores to parents, guardians, high school counselors, and college and university admissions officials. NCSP alleges, however, that its role is limited to scanning the answer sheets and reporting the raw data on the answer sheets to the College Board or its designees. As such, NCSP denies that it reported any scores to parents, high school counselors, or college admissions officials. Nevertheless, Plaintiffs' allegations that NCSP reported incorrect test results to the College Board which then reported SAT scores to parents, high school counselors, and college admissions officials are sufficient to withstand a motion to dismiss. Here, the alleged defamatory statements are not typical oral or written assertions, but rather the nearly half-million test results. Plaintiffs have alleged who made the allegedly libelous statement (NCSP), to whom

(the College Board and then to parents, high school counselors, and college admissions officials), and where (in SAT score reports). The Court therefore concludes that Plaintiffs have met the minimum pleading requirements for defamation.

Finally, NCSP argues that misreported scores do not impact Plaintiffs' reputations in their communities, and because such injury is a required element of a defamation claim, the count should be dismissed. In support of its argument, NCSP cites to *Landers v. National Railroad Passenger Corp.*, 345 F.3d 669, 672 (8th Cir. 2003), which affirmed a summary judgment decision of this court holding that as a matter of Minnesota law, a numerical job rating was not defamatory. In that case, however, the message to any member of the public who understood the rating system in question would have been that the employee was performing satisfactorily. Although the question of whether a statement may reasonably be construed as defamatory is fact intensive, the analysis begins with an issue of law for the trial judge. If the statement is capable of defamatory meaning, it is for the jury to decide if it was so understood. *Id.* (citing *Utecht v. Shopko Dep't Store*, 324 N.W.2d 652, 653-54 (Minn. 1982)). NCSP points to one case in which lower than deserved test scores were deemed not to impact a plaintiff's reputation in the community. *See Coates v. Law School Admission Council*, No. Civ. A. 105CV0641JDB2005, WL 3213960 (D.D.C. Oct. 25, 2005). In *Coates*, however, there was no evidence to suggest that the test score was reported to anyone other than the plaintiff. Additionally, Plaintiffs note that Minnesota courts have permitted at least one defamation case arising out of misscored tests to survive a motion for summary judgment. *See Kurvers v. Nat'l Comp. Sys., Inc.*, No. MC-00-11010 (Minn. Dist. Ct. May 23, 2002). The Court is aware that *Kurvers* did not consider whether the statements were actually defamatory, but only addressed whether the defendant had an absolute or qualified privilege. Nevertheless, the Court declines to

hold that as a matter of Minnesota law, misreported test scores can never give rise to a claim for defamation. Accordingly, the Court denies NCSP's motion to dismiss Plaintiffs' claim for defamation against NCSP.

### 4.      Implied and express warranties

In counts ten and eleven of the amended complaint, respectively, Plaintiffs allege that NCSP breached the implied warranties of merchantability and fitness for particular purpose. In count twelve of the amended complaint, Plaintiffs allege breach of express warranty. Plaintiffs' implied and express warranty claims against NCSP fail for the same reason that their implied and express warranty claims against the College Board were dismissed: Article 2 of the UCC applies only to the sale of goods, not the sale of services. *See LeSueur Creamery*, 660 F.2d at 346. The predominant purpose of the Services Agreement between NCSP and the College Board is for the scanning of the SAT answer sheets and further support in the administration of the SAT. All tangible products used in that endeavor are incidental to the services provided by NCSP. Furthermore, because Plaintiffs hold no third party beneficiary rights under the Services Agreement, they cannot seek redress for breach of warranty under the Services Agreement. Accordingly, the Court dismisses counts ten, eleven, and twelve of Plaintiffs' amended complaint.

### 5.      Magnuson-Moss Warranty Act

In count thirteen of the amended complaint, Plaintiffs allege that NCSP violated the MMWA. Plaintiffs' MMWA claim against NCSP fails for the same reason that their MMWA claim against the College Board was dismissed: neither the services provided by NCSP nor the physical products incidentally involved in NCSP's support of the administration of the SAT can be considered "consumer products" within the meaning of the MMWA. Accordingly, the Court

dismisses Plaintiffs' MMWA claim against NCSP.

### 6.      False advertising and consumer frauds

In count fourteen of the amended complaint, Plaintiffs allege that NCSP violated Minn. Stat. § 325F.69, subd. 1 (2005), by committing consumer fraud, and Minn. Stat. § 325F.67 (2005) for a false advertising.  NCSP argues that Plaintiffs failed to plead their claims with the particularity required under Federal Rule of Civil Procedure 9(b).  In cases brought in federal court, Rule 9(b) applies to both common law and statutory fraud claims made under Minnesota law where the gravamen of the complaint is fraud.  *See Tuttle v. Lorillard Tobacco Co.*, 118 F.Supp.2d 954, 963 (D. Minn. 2003); *United States v. Napco Int'l, Inc.*, 835 F.Supp. 493, 495 (D. Minn.1993); *see also NCC Sunday Inserts, Inc. v. World Color Press, Inc.*, 692 F. Supp. 327, 330 (S.D.N.Y. 1988) (holding that "it is federal law which governs procedural issues of state law raised in federal court").

To meet the heightened pleading requirement of Rule 9(b), a plaintiff must set forth the "who, what, when, where and how" for each alleged fraud.  *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 550 (8th Cir. 1997).  As such, "conclusory allegations that a defendant's conduct was fraudulent are not sufficient to satisfy this rule."  *Commercial Prop. Inv., Inc. v. Quality Inns Int'l Inc.*, 61 F.3d 639, 644 (8th Cir. 1995).  Here, Plaintiffs allege that:

> Defendant's wrongful conduct includes, by way of example and not by limitation: Defendant's fraudulent, misleading, and deceptive statements and practices relating to the quality and accuracy of Defendant's testing and scoring products, including misrepresentations that Defendants have or will provide adequate quality assurance in assessing the scoring errors associated with the October 2005 SAT.

In support of their false advertising claim, Plaintiffs have failed to identify a single advertisement disseminated to the public in Minnesota.  Similarly, Plaintiffs have failed to identify any specific example of consumer fraud, relying instead on sweeping allegations of

"fraudulent, deceptive, misleading, and deceptive statements and practices."   Having failed to plead the who, what, when, where, and how of their consumer fraud and false advertising claims, Plaintiffs' amended complaint falls short of the specificity required under Rule 9(b). Accordingly, the Court dismisses count fourteen of the amended complaint.

### III.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

1.    Plaintiffs' motion for a preliminary injunction [Docket No. 2] is DENIED.

2.    The College Board's motion to dismiss Plaintiffs' Amended Complaint [Docket No. 20] is GRANTED IN PART and DENIED IN PART.

3.    NCSP's motion to dismiss Plaintiffs' Amended Complaint [Docket No. 24] is GRANTED IN PART and DENIED IN PART.

4.    Count I of the Amended Complaint is DISMISSED insofar as it asserts strict liability.

5.    Count II is DISMISSED against the College Board.

6.    Counts V, VI, VII, VIII, IX, X, XI, XII, XIII, XIV, and XV are DISMISSED.

Dated:  November 9, 2006

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge